# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 14, 2010 Session

## STATE OF TENNESSEE v. FREDERICK LAMONT MOORE

**Appeal from the Circuit Court for Madison County**
**No. 09-77    Roy B. Morgan, Jr., Judge**

---

**No. W2009-01266-CCA-R3-CD  - Filed March 9, 2011**

---

Following a jury trial, the Defendant, Frederick Lamont Moore, was convicted of first degree premeditated murder; first degree murder committed while in the perpetration of a felony (felony murder); aggravated kidnapping, a Class B felony; and two counts of tampering with evidence, a Class C felony.  The trial court merged the first degree premeditated murder conviction with the felony murder conviction and ordered a sentence of life imprisonment for the resulting conviction.  As to the remaining counts, the trial court ordered a sentence of 20 years for the aggravated kidnapping conviction and concurrent sentences of 10 years for each of the tampering with evidence convictions.  The trial court also ordered the Defendant to serve his 20-year sentence for aggravated kidnapping consecutively to his life imprisonment sentence for the first degree murder conviction.  In this appeal as of right, the Defendant contends that the evidence was insufficient to sustain his convictions.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and J.C. MCLIN, JJ., joined.

Robert Brooks, Memphis, Tennessee (on appeal), and George Morton Googe, District Public Defender (at trial), for the appellant, Frederick Lamont Moore.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; James G. Woodall, District Attorney General; Jody S. Pickens and Alfred Lynn Earls, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

In the early morning hours of December 9, 2007, a 9-1-1 call was placed to the Jackson Police Department call center from 61 Sherwood Lane, where the 25-year-old victim, Latoya Cole,[1] resided. The call was placed at 1:17:54 a.m. but ended before the dispatcher was able to answer the phone. The dispatcher called the number back at 1:18:34 a.m. and, after receiving no answer, dispatched Officer Buddy Crowell of the Jackson Police Department to the residence at 1:19:07 a.m. Officer Crowell arrived at the residence at 1:22:59 a.m., approximately five minutes after the 9-1-1 call was placed. Officer Chris Falacho of the Jackson Police Department was also dispatched to the residence. The officers knocked on the door and, after receiving no response, walked around the perimeter of the residence. Having found no signs of forced entry, the officers attempted to open the front door, which they found was unlocked. The officers opened the door and went through the living room and the kitchen, where they found that the cabinet doors were open and that the phone was on the floor. A spot of what appeared to be blood was "beside the phone on the floor." Officer Crowell went into the master bedroom, which was located next to the kitchen. In the master bedroom, Officer Crowell found a large wet stain of what appeared to be urine on the bed and a large red stain that appeared to be blood on the left side of the bottom of the bed. He notified Officer Falacho of the discovery and then contacted his supervisor.

After searching the entirety of the master bedroom, officers found a gold necklace "on the right side of the room by the chest of drawers," a .25 automatic bullet shell casing near the middle of the bed, what appeared to be human teeth and gum fragments on the bed, and a blue towel that was found on the right side of the bed and stained with what appeared to be blood. Officer Crowell also found a bullet hole that went through the comforter, sheets, mattress, box springs, and dust ruffle on the bed. After moving the bed, he found a .25 caliber "bullet lodged in a piece of carpet in the floor" underneath the bed. The comforter from the bed was taken and analyzed. In addition to the urine stain and bloodstain, gunpowder residue spackling was also found on the comforter. The officers were unable to find any fingerprints in the residence.

As the officers were searching the residence, the victim's sister, Lakenya Cole, arrived. Lakenya Cole called her mother, Wanda Cole, and brother, Brandon Guyton, and told them about the discovery at the house and that the victim was missing. Wanda Cole called the Defendant, who was the father of two of the victim's children, to ask him if he had seen the victim recently. The Defendant told her that he had not seen the victim since Thursday or Friday. Brandon Guyton called the Defendant, and the Defendant told Brandon Guyton that he had not seen the victim and that he was on his way to Nebraska. Wanda Cole

---

[1] The victim was also referred to as Latoya Guyton.

and Brandon Guyton repeatedly called the Defendant after they initially spoke with him; however, the Defendant did not answer or return their telephone calls.

Bonnie Cole, the victim's aunt, lived with the victim and Lakenya Cole at 61 Sherwood Lane. The victim's four children, and Lakenya Cole's daughter also lived at the residence.[2] Latoya and Lakenya Cole were the only two people who had keys to the residence, and it was the practice of those living in the residence to lock the screen door and the front door when they were at home. The screen door could only be unlocked from inside the house.

Lakenya Cole called the victim at approximately 12:00 a.m. on the night the victim disappeared and asked the victim, who sounded as if she had been asleep, if she could find the number for the Jackson Police Department. The victim retrieved the number and gave the number to Lakenya Cole. Bonnie Cole also called the victim that night to see if the victim was awake and at the residence. The victim answered the telephone, and "around" 12:00 or 1:00 a.m., Bonnie Cole went to the house. Bonnie Cole did not see any cars in the driveway when she went to the front door. The victim, who appeared as if she had been sleeping and was "wrapped up in a leopard blanket," came to the door and let Bonnie Cole inside the house. Bonnie Cole retrieved some money from the bathroom, which was located next to the kitchen on the left side, and then walked back through the kitchen and the living room to the front door. Bonnie Cole asked the victim if she was well, and the victim responded affirmatively and told her that it was "okay for [her] to go." As Bonnie Cole was leaving, the victim locked the screen door and the front door.

Dennis Smartt, who lived at 51-L Sherwood Lane with his wife and son, Brad Smartt, arrived home from work sometime between 12:00 and 12:30 a.m. on December 9, 2007. When he arrived home, he noticed a "[s]ilver whitish, grayish" Ford Taurus[3] parked in the center of the driveway that he shared with his neighbor. Brad Smartt also arrived home between 12 and 12:30 a.m. on December 9, 2007. When he arrived home, he also noticed a silver Ford Taurus[4] "with some tinted windows" in his driveway. At approximately 1:00 a.m. on December 9, 2007, Brad Smartt was sitting in his car with his friend when he saw

---

[2] There was testimony presented at trial that a woman named Jamie McClinton also lived at the residence. However, it was unclear from the testimony who this person was and whether she actually lived at the residence.

[3] Dennis Smartt testified that the Defendant's car was substantially similar to the car that he observed in his driveway that night.

[4] Brad Smartt also testified that the Defendant's car was substantially similar to the car that he observed in his driveway that night.

a black man, who was wearing a hat, and woman walking into his yard. He could not tell which direction they were walking from, but he guessed that they were walking away from the direction of 61 Sherwood Lane. According to him, it appeared as if the man was helping the woman like "a football player on the field was injured and another player helped him off." It looked like the woman, who appeared "[j]ell-o-like," was "holding onto" the man because her arms were around his neck. They walked into Brad Smartt's driveway, and the man helped the woman into the Ford Taurus. The man had to pick the woman's feet up in order to get her into the car.

On the afternoon of December 9, 2007, the Defendant voluntarily came to the Jackson Police Department after Investigator Danielle Jones of the Jackson Police Department called him. The Defendant arrived at the police department at approximately 2:10 p.m. and had two cellular telephones in his possession. The telephone number of one of the telephones was 571-9026, and the telephone number of the other telephone was 731-267-5636. Once at the police department, the Defendant allowed Investigator Jones to obtain a deoxyribonucleic acid (DNA) sample from him. He also allowed officers to search his vehicle, a four-door, silver Ford Taurus.[5] Captain Michael Holt[6] of the Jackson Police Department drove the Defendant's vehicle into the evidence storage bay at the back of the police department. As he was driving the vehicle, he noticed that "[t]he car was very clean" and "smelled like it had been . . . freshly cleaned."

Investigator Michael Parson of the Jackson Police Department searched the Defendant's vehicle and found a Bible, a pack of USA Gold menthol cigarettes, a partial roll of paper towels, one roll of silver duct tape, four Brillo pads in a box, Armor All Protectant Wipes, Meguiar's Hot Shine Tire Spray, and Armor All Auto Glass Cleaner. Special Agent Lawrence James of the Tennessee Bureau of Investigation (TBI) serology DNA division also assisted in the search of the Defendant's car. Special Agent James found a bloodstain[7] "located in the floorboard of the passenger seat . . . at the base of the front passenger seat on the inside next to the console area." "[S]ome of that stain was in the carpet," and "[s]ome of the stain was on . . . a plastic cover that covered the bolts of the base of the seat." "[T]here was also a little bit of the stain on the underside of the console, the plastic console area, the middle of the front seat where the armrest is." After removing the console, he found a "droplet" of blood "on the . . . underside of that console." He was unable to determine how

_____

[5]Mary Ann Pruitt, the Deputy Clerk of the Madison County Clerk's Office, testified that the Defendant owned a 1997 four-door, gray Ford and that he purchased the vehicle on February 7, 2007.

[6]Captain Holt was a lieutenant at that time.

[7]He tested all of the stains found in the car using a chemical screen test. If the chemical screen test revealed that the stain likely contained blood, he obtained samples of the stain for further testing at the TBI lab.

long the blood had been there, but he was able to generate a DNA profile from the bloodstains that he found in the vehicle.

Special Agent James examined other stains that he found in the vehicle; however, these stains did not presumptively test positive for blood. He also tested the front passenger door for blood and found that some areas tested "presumptively positive for blood" but that because he could not "visualize the stain," he was unable to state whether blood was actually present. He believed that if there was blood there, the blood had been "long removed."

Investigator Parson went to the victim's residence and obtained swabs from the blood found at the residence. He sent the swabs along with the teeth and gums, the blue towel, and the comforter found at the residence to the TBI to aid in the investigation of the case. The victim's family gave him what was believed to be the victim's toothbrush and a pair of underwear, and he also sent these items to the TBI. In his investigation, he obtained buccal swabs from the victim's mother; father, Edward Guyton; and son, Griffin Cole. At some point, the victim's mother gave Investigator Parson "one box of CCA Blazer .25 auto shells containing 44 shells" and told him that she found the ammunition in the victim's personal items.

Special Agent James received the items sent by Investigator Parson and attempted to obtain a DNA profile from the teeth and gums found at the victim's residence; however, he was not able to test the teeth and gums because they had not been properly preserved. He was able to test the comforter found at the victim's residence for blood. His testing revealed the presence of blood, and he was able to obtain a DNA profile from the comforter. He also tested the spot of what appeared to be blood by the telephone in the victim's residence. This spot tested positive for blood, and he was able to obtain a DNA profile from that stain. Using the victim's underwear, he was able to obtain a DNA profile that he used as a standard for the victim. He stated that the DNA profiles he obtained from the stains in the car and the stains at the residence matched the DNA profile that he obtained from the victim's underwear. Using these findings, he issued two reports, one on February 14, 2008 and another on March 19, 2008.

On March 24, 2008, approximately three and a half months after the victim's disappearance, Richard Lee Cain was wading in Turk Creek in Pinson, Tennessee with his "waders" on looking for old antique bottles and arrowheads when he found a body. The body was lying on the creek bank and was located 100 to 150 yards from Justin's Tomato Company. Mr. Cain called the police department and reported his discovery.

Sergeant Felicia Stacy of the Madison County Sheriff's Department arrived at the creek at approximately 6:00 p.m. to investigate Mr. Cain's discovery. When she arrived at

the location, she saw the body "laying on the bank of the creek." The "head of the body was laying closer to the water," the "feet were kind of lodged underneath some tree trunks or branches from all of the debris that had been washed down the creek." The body was "very badly decomposed;" therefore, she was concerned about detaching the limbs as they attempted to retrieve the body from the creek bank. Eric Echtenkamp, an assistant coroner of the Madison County Medical Examiner's Office and paramedic of Jackson General Hospital, also came to Turk Creek and assisted in the removal of the body from the creek bank. He believed that the body "appeared to be that of a female" but that the decomposition of the body prevented any further identification. After they retrieved the body, it was sent to Jackson General Hospital.

Doctor Amy McMaster of Forensic Medical Management Services testified at trial that she performed the autopsy of the body found in Turk Creek on March 25, 2005. She said that the body was in the advanced stage of decomposition and that it had some degree of skeletonization. The bone around the face and the head had begun to show, the "eyes had completely decomposed," some of the teeth were exposed, the hair on the scalp had come off, the "majority of the soft tissue of the breasts were absent," the ribs were exposed, and some of the "phalangeal bones" were missing on the hands. However, Dr. McMaster was able to identify the body by matching "several distinct and identifying tattoos" that were still present. The body had a tattoo of some type of a wildcat on the right upper arm; tattoos of roses on the left upper arm; and a tattoo of the word, "Griffin," on the right side of the back. After receiving information from the victim's family regarding the victim's tattoos, she was able to positively identify the body as that of Latoya Cole. Through the autopsy, Dr. McMaster found that the victim had a gunshot wound on the "right side of her upper jaw, the maxilla." In addition to the gunshot wound, the victim's teeth were broken in the area associated with the gunshot wound. She also found a bullet in the left side of the mandible in the soft tissue.

Dr. McMaster testified that the bullet injured the victim's mouth, tongue, and "blood vessels that supply the mouth and the tongue." The victim's tongue would have swelled and bled, causing the victim to "swallow[] or aspirate[] her own blood." The victim could have died from the aspiration of the blood, from the blood loss in the area, or from the swelling of the tongue, which would have made it difficult for the victim to breathe. Dr. McMaster said that the victim could have "possibly" survived the wound because the only wounds that are "immediately fatal are gunshot wounds to the brain and spinal cord." She said that she "would not have expected this particular gunshot wound to cause immediate death" and that the victim "would've probably lived more than five minutes" after the infliction of the wound.

Marie McGee of Forensic Medical Management Services testified that she resected a section of the victim's rib and femur for further identification and testing purposes. Dixie

Peters, a DNA analyst with the missing persons unit at the University of North Texas, Health Science Center for Human Identification, testified that she received the victim's resected rib and femur and that she also received buccal swabs containing DNA from the victim's mother and father. Ms. Peters testified that she extracted two types of DNA, nuclear DNA and mitochondrial DNA, from the victim's femur. She stated that nuclear DNA "is contained in the nucleus of the cell" and is "inherited from both your mother and your father." She stated that mitochondrial DNA "is not uniquely your own" and "is passed down from your mother to you." She said that "your mitochondrial DNA profile would look exactly as that of your mother's or any of your siblings, anybody along the same maternal lineage." She said that if she were given a femur or rib from a person and a sample of genetic material from the suspected mother of that person, she would be able to tell if that person was maternally related to the suspected mother. In this case, she used the victim's femur to generate the victim's nuclear and mitochondrial DNA profile. She compared those profiles with the buccal swabs that she received and was able to determine that "it [wa]s 52 billion times more likely that the unidentified human remains were offspring of . . . Edward Guyton and Wanda Cole, as opposed to the unidentified human remains not being related." She further stated that the mitochondrial DNA extracted from the femur was "an exact match to Wanda Cole."

Ms. Peters said that her findings corresponded with Special Agent James's findings. Special Agent James testified that the DNA profile that Ms. Peters generated from the victim's femur matched the DNA profiles that he generated from the victim's underwear and the bloodstains found in the car and at the residence.

Investigator Parson testified at trial that he drove from the victim's residence to the location where the body was found using two different routes. On each trip, he obeyed the posted speed limits. On his first trip, he left at 1:17 a.m., the time of the hang-up call to the 9-1-1 dispatcher, and drove the "most direct route . . . all the way down Royal Street through downtown and all the way to the intersection of South Highland Avenue." He then "took a left on South Highland Avenue at the fairgrounds [and] went straight to the area of Pinson." He "arrived at the first bridge on Old Henderson Road in 16 minutes from the time that [he] left 61 Sherwood Lane." After arriving at the location, he drove back to the residence and "sat there" for a "full minute" before driving his second route to the location of the body. On his second route, he drove "back down North Royal Street, took a left on North Parkway, went out to F.E. Wright . . . went back down toward[] Highway 70 . . . looped around on the Highway 70 Bypass down to Chester Street [and] took a left on South Highland Avenue and went to the Pinson area." He stated that the second route took him "about two minutes longer" than the first route.

Bryant Daniel, the victim's cousin, who lived in Pinson, Tennessee testified that the Defendant used to stay at his house for a week to a month in the summer when they were

younger. He testified that he lives approximately one mile from Justin's Tomato Company. He said that he maintained contact with the Defendant through the years and that he gave the Defendant a cellular telephone with the number 731-267-5636 because the Defendant needed a cellular telephone for his job.

Special Agent Cervina Braswell, a forensic scientist in the firearms identification unit of the TBI, testified at trial that she received a .25 caliber cartridge case, a film canister containing a bullet lodged in a piece of carpet, a "box of CCI Blazer .25 auto ammunition," and the bullet taken from the victim's jaw on December 12, 2008. After testing and analyzing the bullet found in the carpet and the bullet found in the victim's jaw, she determined that "both of those bullets were fired from the same weapon." She was able to determine that these bullets were .25 caliber bullets and that the bullets were "consistent in type and design as the CCI Blazer brand cartridges" found in the box of ammunition that she was provided. She was also able to determine that the bullets could have been fired from a gun manufactured by Raven Arms. She stated that Raven Arms's weapons are "lower-end guns" that can be purchased for "45 to 100" dollars. She said that guns manufactured by Raven Arms are not "as well made as some other guns, and, therefore, the rate of malfunction is higher." Specifically, when firing these weapons, a "stovepipe malfunction" can occur, where the "empty cartridge case doesn't fully eject from the firearm" and "gets caught . . . when the slide closes," leaving the "spent cartridge in an upright position." Thus, when this type of malfunction occurs, the shell "stays in the firearm."

Lakenya Cole testified at trial that the victim owned a "little" silver handgun with white grips and that the victim kept this handgun in "her room under her pillow." She stated that this handgun was never found after the victim disappeared. Anthony Barnett of Humboldt Pawn and Sales testified that the victim purchased a .25 caliber Raven handgun on April 9, 2007. He stated that this gun was a small semi-automatic handgun that was worth approximately $79. He said that this type of handgun had received a lot of complaints and was known to "jam a lot."

Lee Hays, the Juvenile Court Clerk in Gibson County, stated that the Defendant and the victim were scheduled to appear in court for a child support matter on December 10, 2007; however, neither party appeared for the hearing. He said that the Defendant had owed child support and a petition for contempt had been issued. At some point, the petition had been dismissed because the Defendant had made some child support payments; however, the Defendant and the victim were still required to attend the hearing on December 10. After December, the Defendant did not make any more child support payments.

Kizzie Davis, an assistant store manager with Verizon Wireless, testified that calls that are placed and received using a Verizon cellular telephone are documented by a system

entitled, Vision 2000. The Vision 2000 system stores the information about the calls automatically. The time of the call, the length of the call, whether the call was placed or received, and what tower the telephone used is documented using this system. She stated that when a person places a call using a cellular telephone, a "signal goes out from their cellphone and goes to a tower, and then that tower redirects [the signal] to the number that you called." If the closest tower is not functioning properly or if the reception is bad, the signal will be redirected to another tower that is "within range." The same system is used when a person receives a call. The tower does not show where the person is located, it only shows which tower the signal accessed.

Ms. Davis had records pertaining to the cellular telephone that was owned by Lakenya Cole but used by the victim. Ms. Davis testified that the last call the victim received and answered was at 12:22 a.m. on December 9, 2007. After 12:22 a.m., the victim's cellular telephone received 108 telephone calls that were not answered and "went directly to the voicemail box."

Ms. Davis also had records pertaining to cellular telephone number 571-9026, one of the cellular telephones that the Defendant had in his possession on December 9, 2007, when he arrived at the Jackson Police Department. These records reflected that the Defendant called Chantell Moore,[8] his ex-wife, at 12:30 a.m. on December 9, 2007. This call lasted 36 seconds, and cell tower number 216 was used for the call. Cell tower number 216 was located at 334 North Cumberland Street, Jackson, Tennessee 38301. The records also indicated that Chantell Moore called the Defendant's cellular telephone 12 times after she received the call from the Defendant at 12:30 a.m. and that each time she called, the call was forwarded to the Defendant's voicemail inbox, meaning that either the Defendant was not answering his telephone, the telephone was turned off, or the power had run down. The records also indicated that the Defendant called a cellular telephone number used by Terrance Morrow, the Defendant's step-brother, on December 9, 2007 at 1:31 p.m. using cell tower number 221 and that the call lasted 328 seconds. Cell tower number 221 was located at 800 Hudson Lane, Brownsville, Tennessee 38012.

Wesley Fay, a Radio Frequency Engineer at AT&T Wireless, testified that when a cellular telephone is turned on, that phone communicates with the "mobile telephone switching office," which he identified as the "switch." The cellular telephone is "constantly communicating with the tower and switch at all times." He said that when a person makes a telephone call using a cellular telephone, a signal emitting from the telephone will access the "closest tower serving [that particular] area." The signal then "communicate[s] with the

---

[8]Ms. Moore testified that she received a text message from the Defendant between 1:30 and 2:00 a.m. on the night the victim disappeared. In his message, the Defendant asked Ms. Moore if she loved him.

switch, and the switch would validate if it was a valid active call or not, and then it would proceed to go send it out to wherever it needed to go." The switch determines where the receiving telephone is located and sends the information to that telephone.

Mr. Fay said that in the AT&T network, an automated record is kept of every telephone call that is placed and received. Additionally, when a cellular telephone is turned on, the cellular telephone can be located by AT&T and would still respond to the switch if the cellular telephone was called and not answered. If a cellular telephone utilizes the switch, AT&T has a record of that action if the action was "attached to a tower." Each cellular telephone tower has a particular coverage area; however, if a tower was overloaded, calls that would normally be routed through that tower would be redirected to the next closest tower. Mr. Fay stated that at the time of the victim's disappearance, he did not believe that any of the towers would have been "overloaded with consumers." He stated that "most towers of 400 feet are probably limited to 10 to 12 miles" of coverage area.

Mr. Fay had the cellular telephone records pertaining to the number 731-267-5636, the other cellular telephone that the Defendant had in his possession on December 9, 2007, when he arrived at the Jackson Police Department. This cellular telephone was registered to Bryant Daniel, the Defendant's cousin. The records contained information regarding calls placed and received on December 9, 2007.

Philji Johns, another Radio Frequency engineer at AT&T Wireless, testified that he generated a map[9] using the records from the Defendant's cellular telephone. He stated that his map reflected which particular tower was accessed at a particular time by the Defendant.

The Defendant's cellular telephone records and the maps generated by Mr. Johns and Mr. Williams reflected that the Defendant called the home telephone number belonging to Pamela Ewing, the Defendant's aunt who lived in Pinson, Tennessee, at 1:46:09 a.m. and that the call lasted 19 seconds. This call used tower number CR1112, the Chickasaw tower, which serviced Madison County and was located north of Highway 100, near Turk Creek. The Defendant received a call from Wanda Cole at 2:09:16 a.m. that lasted 12 seconds. This call used tower number CR1344, the Blue Henderson Tower, which serviced Henderson, Tennessee in the "extreme east" side of Chester County but was also located near Pinson, Tennessee. The Defendant received a call from Brandon Guyton at 2:11:07 a.m. that lasted 14 seconds. This call used tower number CR1344, the Blue Henderson Tower. The Defendant received two telephone calls from Wanda Cole's home telephone number, one at 2:16:24 a.m. and one at 2:27:52 a.m. These calls were forwarded to the Defendant's

_____

[9]Patrick Williams of the City of Jackson Planning Department also generated a map using the latitude and longitude locations of the towers used by AT&T. This map was also shown to the jury and used by the State.

voicemail inbox and used tower number CR1161, the Reagan Tower, which served areas around Highways 100 and 22. The Defendant also received a text message at 2:27:57 a.m. using tower number CR1161, the Reagan Tower. The Defendant received another telephone call from Wanda Cole's home telephone number at 2:39:33 a.m. that lasted 0 seconds. This call used tower number CR1026, the Lexington Tower, which was located north of Highway 412. The Defendant received two text messages, one at 10:08:43 a.m. and one at 10:08:57 a.m., using tower number CR112261, the Shelby Tower, which is in Memphis, Tennessee.

Terrance Morrow, the Defendant's step-brother, testified for the Defendant. Mr. Morrow stated that he lived in Memphis, Tennessee in 2007 and that the Defendant came to see him on the night the victim disappeared. The Defendant arrived sometime between 11:30 p.m. and 12:30 a.m. as Mr. Morrow was leaving his apartment to go to a party. When Mr. Morrow returned sometime between 4:00 and 4:30 a.m. on December 9, 2007, the Defendant was asleep on his couch. The Defendant was gone when Mr. Morrow woke up sometime between 10:00 and 11:00 a.m. on December 9, 2007. Mr. Morrow stated that the Defendant called him that afternoon and told him that he was on his way back to Jackson, Tennessee to go to the Jackson Police Department.

The State recalled Mr. Johns, who testified that the Defendant's cellular telephone would not access the Chickasaw, Blue Henderson, Reagan, or Lexington towers if his cellular telephone was being used in Memphis, Tennessee. Mr. Johns admitted that the telephone records cannot pinpoint the exact location of the person using a cellular telephone and that the records only reflect which sector of the cellular telephone tower a particular telephone used. He stated that a call had to be made or received in order for that call to be reflected on the billing record and that if a particular tower were overloaded when a call was placed or received, the signal would be sent to the "next closest tower."

## ANALYSIS

The Defendant contends that the evidence was insufficient to sustain his convictions when the evidence used to convict him was entirely circumstantial. The Defendant admits that the State "established a circumstantial case against the [D]efendant" but asserts that the evidence submitted at trial was not enough to establish certainty of the Defendant's guilt. The State responds that the evidence was sufficient enough for a jury to conclude that the Defendant shot the victim, kidnapped her, and disposed of her body and any evidence that would link him to the crime. In the Defendant's reply brief, the Defendant asserts that the State misstated the evidence and noted evidence of "little probative value" in its brief.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable

-11-

to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). The appellate court does not re-weigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Id.</u>; <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). "This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence." <u>State v. Pendergrass</u>, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In this case, the Defendant contends that there was no direct evidence that he killed the victim and then disposed of her body. However, "[i]t is well established that circumstantial evidence alone may be sufficient to support a conviction." <u>State v. Richmond</u>, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999) (citing <u>State v. Buttrey</u>, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1999)). "The inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." <u>Marable v. State</u>, 313 S.W.2d 451, 457 (1958) (citation omitted). On appeal, "[t]he standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" <u>State v. Dorantes</u>, – S.W.3d – , No. M2007-01918-SC-R11-CD, 2011 WL 208306, at *7 (Tenn. Jan. 25, 2011) (quoting <u>State v. Hanson</u>, 279 S.W.3d 265, 275) (Tenn. 2009)). Indeed, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of [circumstantial] evidence." <u>Id.</u> at *8 (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

The Defendant was convicted of first degree premeditated murder and felony murder. A conviction of felony murder, as charged in the indictment, requires proof of a "killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping." Tenn. Code Ann. § 39-13-202(a)(2). First degree premeditated murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. 39-13-202(d) (internal quotation marks omitted). The element of premeditation only requires the Defendant to think "about a proposed killing before engaging

in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Factors from which a jury may infer premeditation include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of the intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." Bland, 958 S.W.2d at 660.

The Defendant was also convicted of aggravated kidnapping and two counts of tampering with evidence. A conviction of aggravated kidnapping, as charged in the indictment, required proof beyond a reasonable doubt that the Defendant "knowingly remove[d] or confine[d] another unlawfully so as to interfere substantially with the other's liberty" and that the defendant was "in possession of a deadly weapon or threaten[ed] the use of a deadly weapon" while kidnapping the victim. Tenn. Code Ann. §§ 39-13-302(a), -304(a)(5). Relative to the Defendant's convictions of tampering with evidence, the statute states, in pertinent part, that it is "unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to . . . [a]lter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding." Tenn. Code Ann. § 39-16-503(a)(1).

The evidence reflects that a black man parked his car near the victim's residence and that the victim allowed the man to enter her residence. This man somehow obtained the victim's small handgun and shot at the victim two times. One shot missed the victim, and the other shot hit her in the face, ultimately killing her. As the victim was bleeding and likely fleeing from the man, she went to the kitchen and attempted to summon help. The victim's call was disconnected before she could speak with the 9-1-1 dispatcher. The man then forced the victim to his car, while still maintaining control of her handgun. The victim was so badly wounded that she was unable to walk without the aid of the man; however, the victim was likely still alive at that point. Once inside the car with the victim, the man drove to Pinson, Tennessee, where he disposed of the victim's body in Turk Creek.

The Defendant was intimately familiar with the victim, having fathered two children with her. As a teenager, the Defendant had spent a significant amount of time in the area in which the victim's body was found. The Defendant placed and received calls using cellular telephone towers that were located near where the victim's body was found. These calls were placed and received around the time that the victim was murdered and transported to Turk Creek. Additionally, knowing that he was suspected in the victim's disappearance, the Defendant attempted to thoroughly clean his car before arriving at the Jackson Police Department for questioning. However, a small amount of blood matching the victim's DNA profile was still found in the Defendant's car. The victim's weapon, which was consistent with the type of weapon used in the murder and was kept at her residence, was never found.

While the evidence of the Defendant's guilt was entirely circumstantial, the evidence was sufficient to establish that the Defendant shot the victim in the face, ultimately killing her, and then forced her to leave her residence, while she was still alive, before disposing of her body and attempting to destroy any evidence that would implicate him in her murder. Thus, the evidence was sufficient to sustain the Defendant's convictions of first degree premeditated murder, felony murder, aggravated kidnapping, and two counts of tampering with evidence.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE